**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIANA MARTINEZ, | Docket No.: |
| Plaintiff, | |
| vs. | **COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |
| JOHNSON & JOHNSON CONSUMER INC.<br>and VOGUE INTERNATIONAL LLC, | |
| Defendants. | |

Plaintiff Diana Martinez, by and through her undersigned counsel, brings this lawsuit against Johnson & Johnson Consumer Inc. ("J&J") and Vogue International LLC ("Vogue") (collectively, "Defendants"). Plaintiff alleges as follows based on personal knowledge concerning all facts related to herself, and investigation of her counsel and information and belief concerning all other matters.

## INTRODUCTION

1.      Plaintiff and hundreds or thousands of other consumers suffered hair loss and other injuries after using OGX branded shampoos and conditioners designed, manufactured, distributed, and/or sold by Defendants that contained and/or contain a dangerous ingredient called DMDM hydantoin ("OGX Products").

2.      The OGX Products are marketed to customers—through labeling and other advertisements—as containing a formula that will smooth hair, add softness and shine, and prevent frizzing and tangling. According to Defendants, the OGX Products "help[] to infuse nutrients into every strand and creates the appearance of thicker, fuller, healthier looking hair."

3.      Contrary to Defendants' representations, the OGX Products' formula contains or contained DMDM, a formaldehyde donor known to slowly leach formaldehyde when combined with water. Formaldehyde is a well-known human carcinogen and allergen shown to cause cancer and other harmful reactions when applied to the skin. DMDM has long been

associated with causing hair loss, thinning hair, dermatitis, and other adverse scalp reactions and has been the subject of numerous complaints and various lawsuits well before Plaintiff was injured.

4.    Defendants have known of the dangers posed by DMDM for at least a decade. In August 2012, for example, J&J acknowledged the harms of DMDM and announced that, by the end of 2015, it would remove formaldehyde and other harmful ingredients from its adult personal care products. That announcement followed closely from J&J's earlier announcement and commitment to remove those same harmful ingredients from infant care products by the end of 2013.

5.    Defendants' knowledge of the dangers of DMDM is further reinforced by J&J's website, which states:

> Many preservatives do not meet our safety and care standards. Examples of preservatives that we will not use in any skin care product include bromochlorophen, formaldehyde, paraformaldehyde, formic acid, bronopol, dichlorobenzyl alcohol, triclocarban, p-chloro-m-cresol, triclosan, methenamine, ketoconazole, silver citrate, thimerosal, chloroacetamide, 5-bromo-5-nitro-1,3-dioxane, butylparaben, isobutylparaben, and benzylparaben. In addition, examples of preservatives that don't meet our standards for baby products also include methylparaben, ethylparaben, propylparaben, iodopropynyl butylcarbamate, quaternium-15, **DMDM hydantoin**, imidazolidinyl urea, and diazolidinyl urea (emphasis supplied).[1]

6.    In 2016, J&J acquired Vogue, one of America's leading manufacturers and distributors of hair care and personal care products, including the OGX Products that are at issue in this lawsuit.

7.    Although DMDM did not meet J&J's safety standards, and despite acknowledging the dangers and working to remove harmful DMDM from J&J's own line of adult and baby care products, following J&J's 2016 acquisition of Vogue, Defendants

---

[1]    https://safetyandcarecommitment.com/ingredients/preservatives

continued to design, manufacture, and sell Vogue OGX Products with DMDM until September 2021.

8.      In or shortly before September 2021, Defendants stated they would no longer manufacture the OGX Products with DMDM and misleadingly explained the reformulation of OGX Products to remove harmful DMDM as follows:

> Although we're talking about it more now, we've been working for years on achieving a more balanced pH in all our products to improve results for your hair. We actually haven't launched any new hair products with DMDM Hydantoin in the last several years.
>
> After listening to the feedback we've been getting from you about this ingredient more recently, we decided to accelerate our plans to launch our new innovative formulations in all our haircare products by September 2021.[2]

9.      Defendants continued to manufacture and sell OGX Products with DMDM until September 2021 and even now continue to sell OGX Products with DMDM that remain on store shelves despite fully understanding that the dangers posed by OGX Products containing DMDM outweigh any utility those OGX Products provide to consumers.

10.      Defendants also failed to reformulate or manufacture (or delayed reformulating or manufacturing) the OGX Products with safer preservatives or a combination of preservatives even though those alternatives were readily available and doing so was affordable and sensible considering the substantial risks associated with DMDM as demonstrated by DMDM-free formulations for other shampoos and conditioners manufactured and sold by Defendants.

11.      Defendants also falsely and/or misleadingly advertise the OGX Products to improve the health and appearance of hair, including directly on the OGX Products' labeling and through other advertising channels such as the OGX Products' website. Defendants advertise the purported benefits of OGX Products without disclosing known risks to consumers,

---

[2]      https://www.ogxbeauty.com/faqs/formulaevolution/.

including the potential for hair loss, scalp irritation, and allergic reactions. Consumers, like Plaintiff, depend on Defendants to disclose those risks but are instead presented with false, misleading, or incomplete representations regarding the safety and benefits of the OGX Products and suffered injuries as a result.

12.     From the summer of 2017 through the Summer 2021, Plaintiff Martinez used OGX Products containing DMDM—including OGX Renewing Argan Oil of Morocco Shampoo; OGX Renewing Argan Oil of Morocco Conditioner; OGX Quenching + Coconut Curls Shampoo; and OGX Quenching + Coconut Curls Conditioner—to improve the health and appearance of her hair after reviewing product labeling and other advertising touting its benefits. Instead of receiving those benefits, Plaintiff Martinez suffered injuries caused by OGX Products containing DMDM, including substantial hair loss, hair thinning, scalp irritation and dryness, itching, and skin discoloration.

13.     Plaintiff was injured and suffered damages due to Defendants' wrongful conduct when designing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling the OGX Products.

14.     Plaintiff brings negligence and product liability claims against Defendants, including claims arising from injuries caused by the OGX Products' defective design and/or Defendants' failure to warn consumers of the potential harms of the OGX Products.

## PARTIES

15.     Plaintiff Martinez is and was during the time relevant to these allegations a resident of Kings County, New York and is a citizen of New York.

16.     Defendant J&J is a New Jersey-incorporated corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J manufactures, markets, designs, promotes, and/or distributes the OGX Products in New York and throughout the United States.

4

17.    Defendant Vogue is a New York-formed limited liability company with its principal place of business located at 311 Park Place Blvd., Clearwater, FL 33759. Vogue is a wholly owned subsidiary of J&J, and upon information and belief, J&J is Vogue's only member. Vogue manufactures, markets, designs, promotes, and/or distributes the OGX Products in New York and throughout the United States.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(1). Diversity of citizenship exists between Plaintiff and Defendants: Plaintiff is a citizen of New York and Defendants are citizens of New Jersey or Florida. In addition, the matter in controversy in this action exceeds $75,000 exclusive of interest and costs.

19.    The Court has personal jurisdiction over Defendants. Defendants and/or their agents transacted business within the state; made any contract within the state; committed a tortious act within this state; and/or owned, used, or possessed any real estate situated within this state.

20.    Plaintiff's claims arise from conduct Defendants purposefully directed to New York. Defendants' OGX Products are sold at hundreds of local and national retailers, including Wal-Mart, Target, Walgreens, CVS, and Duane Reades throughout New York. Defendants also avail themselves of numerous advertising and promotional materials regarding the defective OGX Products specifically intended to reach consumers in New York, and Plaintiff used and was injured by OGX Products in New York. As a result, requiring Defendants to litigate these claims in New York does not offend traditional notions of fair play and substantial justice

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391. A substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Defendants regularly conduct business and are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**A.    The Vogue Acquisition, the OGX Products, and OGX Product  Representations**

22.    Johnson & Johnson is an American multinational corporation founded in 1886 that develops, markets, and sells medical devices, pharmaceuticals, and consumer packaged goods. J&J is a Johnson & Johnson subsidiary and is one of the world's largest consumer health and personal care products companies. J&J produces infant and adult personal care products, including over the counter medications, cleansers, skin care, moisturizers, hair care, diaper care, sun protection, and nursing products.

23.    In July 2016, J&J acquired Vogue through a merger for $3.3 billion in cash. Vogue markets, develops, and distributes hair care and other personal care products. The Vogue acquisition included many large personal care brands, including OGX and, according to J&J, strengthened its position in hair care.

24.    The OGX Products are sold under the OGX brand name directly from Defendants and through retailers and include: OGX Biotin + Collagen Shampoo; OGX Biotin + Collagen Conditioner; OGX Renewing Argan Oil of Morocco Shampoo; OGX Renewing Argan Oil of Morocco Conditioner; OGX Marula Oil Conditioner; OGX Nicole Guerriero Midnight Kisses Shampoo; OGX Nicole Guerriero Midnight Kisses Conditioner; OGX AntiBreakage and Keratin Oil Conditioner; OGX Detox + Pomegranate & Ginger Shampoo; OGX Nicole Guerriero Mistletoe Wishes Shampoo; OGX Nicole Guerriero Mistletoe Wishes Conditioner; OGX Nicole Guerriero Ice Berry Queen Shampoo; OGX Nicole Guerriero Ice Berry Queen Conditioner; OGX Extra Strength Hydrate & Repair and Argan Oil of Morocco Shampoo; OGX Extra Strength Hydrate & Repair and Argan Oil of Morocco Conditioner; OGX Ever Straightening and Brazilian Keratin Therapy Shampoo; OGX Ever Straightening and Brazilian Keratin Therapy Conditioner; OGX Kandee Johnson Candy Gumdrop Shampoo; OGX Kandee Johnson Candy Gumdrop Conditioner; OGX Kandee Johnson Frosted Sugar

Cookie Shampoo; OGX Kandee Johnson Frosted Sugar Cookie Conditioner; OGX Kandee Johnson Sparkling Cider Shampoo; OGX Kandee Johnson Sparkling Cider Conditioner; OGX Quenching + Coconut Curls Shampoo; OGX Quenching + Coconut Curls Conditioner; OGX Hydrate + Defrizz and Kukui Oil Conditioner; OGX Youth Enhancing + Sake Essence Conditioner.

25.     Defendants promoted the OGX Products as beneficial for hair due to the presence of keratin (a key structural protein found in hair), Moroccan oil, Argan oil, biotin, collagen, coconut oil, and/or other distinctive product attributes.

26.     Moreover, Defendants state on the back label that:

> **Why You Want It . . .**  Discover thicker, fuller, and more abundant looking strands! Helps to thicken and texturize any hair type! Immerse your skinny strands in the super volumizing blend to help create fuller looking, shiny hair.

27.     Likewise, on the OGX Quenching + Coconut Curls Shampoo used by Plaintiff Martinez, Defendants state on the front label that:

> Drench your curls! This nourishing blend with **coconut oil**, **honey** and a **twist of citrus oil** helps to enhance natural softness, boost decadent spirals, and tame frizz for beautiful tumbling waves with bounce and shine.

28.     Moreover, Defendants state on the back label that:

> **Why You Want It . . .**  This rejuvenating blend with luxurious coconut and citrus oils combined with sweet honey helps to de-frizz, hydrate, and bring out your best curl days every day.

29.     Besides labeling, Defendants promote the OGX Products through other advertising channels, including representations written or approved by Defendants on retail websites like Walmart and on the OGX Products' website.

30.     The portion of the OGX website addressing Thick & Full OGX Biotin + Collagen Shampoo states:

> Help thicken and texturize any hair type with just one use. This

7

> powerful formula helps volumize even the skinniest strands into
> fuller and more abundant looking locks.

31.     The portion of the OGX website addressing OGX Quenching + Coconut Curls

Shampoo states:

> Curls look better when they're quenched. So treat your tresses to
> this nourishing and frizz-taming tropical blend, with coconut oil,
> sweet honey and citrus oil, for hair that's as beautiful as it is
> bouncy.

32.     The OGX Products labeling and the OGX Products website do not provide

warnings disclosing to consumers the risk of DMDM (alone or in combination with other

ingredients) or that the OGX Products may cause hair loss and scalp irritation and other adverse

reactions when used properly. Upon information and belief, Defendants do not warn consumers

about those risks through any means.

**B.     The OGX Products Contain or Contained DMDM, a Chemical That Can
Cause Hair Loss, Dermatitis, and Scalp Irritation**

33.     There are various preservatives that are used in cosmetics and hair products,

including formaldehyde donors such as DMDM. Formaldehyde donors (also called

formaldehyde releasers or formaldehyde releasing agents) are chemical compounds that slowly

release formaldehyde and are added to beauty products to prevent microbial growth and extend

shelf-life.

34.     DMDM is an organic compound belonging to a class of compounds known as

hydantoins. It is used in the cosmetics industry and found in the OGX Products. DMDM

releases formaldehyde and works as a preservative and increases shelf life by making the

environment less favorable to microorganisms.

35.     Research has long demonstrated the harmful effects of formaldehyde,

formaldehyde donors like DMDM, and DMDM, including:

- A 1988 patch-test study[3] examining the link between the presence of DMDM in cosmetics and adverse patients pre-sensitized to formaldehyde determined that "aqueous solutions of DMDM hydantoin, in concentrations comparable to those used in cosmetic products, contain enough free formaldehyde to cause dermatitis…," and that despite earlier conclusions that DMDM hydantoin is a safe cosmetic ingredient, "data suggest that an increase in the use of this preservative may also increase the risk of cosmetic dermatitis in patients allergic to formaldehyde." The authors further suggested that cosmetic products with formaldehyde releasing products should have warnings that the products "'contain formaldehyde'. . . whether present as free formaldehyde or bound by a donor."

- The 2005-2006 North American Contact Dermatitis Group concluded DMDM was the 21st most common allergen according to patch test data collected from its members during that time. According to the National Center for Biotechnology Information, DMDMH contains a significant amount of formaldehyde and thus should be avoided in all formaldehyde allergic patients.

- Formaldehyde is a known human carcinogen and is recognized as such by the United State National Toxicology Program and the International Agency for research on Cancer. In 2009, a review of the literature on occupational exposures and formaldehyde shows a link between formaldehyde and leukemia.

- A 2010 study concluded that although "[i]t has been long accepted that formaldehyde-releaser sensitization is attributable to released formaldehyde . . . . clinical studies show the existence of patients allergic to formaldehyde-releasers but not to formaldehyde itself." That same study found DMDM hydantoin to be "reactive per se."

- A 2015 study concluded "determined that longer storage time and higher temperature increase the amount of formaldehyde released from FRPs and could ultimately lead to more severe health concerns."

- A 2017 statistical analysis of 32 years of data concerning allergic contact dermatitis observed a significant increase in positive reactions with formaldehyde and "that the rates of positive reactions to Dimethylol dimethyl (DMDM) hydantoin, remained unchanged."

- DMDM is considered by the U.S. Food & Drug Administration (FDA) as one of the top allergens "that cause the most allergic reactions from the use of cosmetic products." According to the FDA, DMDM can "trigger the immune system to release chemical substances such as antibodies," resulting in reactions such as itchiness, red rashes on the skin, or more extreme reactions.

---

[3]     A patch test is a diagnostic method used to determine which specific substances cause allergic inflammation of a patient's skin.

36.     It is commonly understood that as a person becomes more exposed to an irritant such as DMDM over time the likelihood and severity of the reaction increase. This is called irritant contact dermatitis ("ICD") and can occur in any person if the amount and duration of irritant exposure are sufficient to cause direct epidermal keratinocyte damage.

37.     The irritation of the scalp, including dermatitis, has been linked to hair brittleness and hair loss, with one 2018 study stating that "[a] number of observations have found that premature hair loss may be caused by the poor scalp health associated with either dandruff and seborrheic dermatitis, or psoriasis, indicating that the effect on the preemergent hair fiber may alter the anchoring force of the fiber with the follicle, as evidenced by an increased proportion both of catagen and telogen, and of dysplastic anagen hairs (anagen hairs devoid of hair root sheaths) in the trichogram (hair pluck)."

38.     Due to the foregoing risks, some companies, including Defendants, have removed formaldehyde donors like DMDM from their cosmetics. For instance, in 2017, CVS Health announced that it would be removing "parabens, phthalates and the most prevalent formaldehyde donors (preservative ingredients that can release formaldehyde over time) from . . . store brands CVS Health, Beauty 360, Essence of Beauty, and Blade product lines" and that it planned to stop "shipping products that don't meet these standards to our distribution centers by the end of 2019."

39.     Even though J&J previously represented that it would reformulate personal infant and adult care products to remove DMDM by 2015, Defendants continued to manufacture and use formaldehyde donors as a preservative in the OGX Products until at least September 2021.

40.     Defendants included DMDM in the OGX products despite the existence of comparable and affordable alternatives, including sodium benzoate, glyoxylic acid (or derivatives thereof); potassium sorbate and sorbic acid; citric acid and its salts; rosemary oil

extract; neem oil extract; lavender oil; grapefruit seed extract; vinegars; and reducing the amounts of DMDM.

41.    Defendants have never warned consumers about the dangers of and possible reactions to DMDM or the OGX Products, including the risk of dermatitis, scalp irritation, and hair loss and have only ever informed consumers that products containing DMDM are safe for use. For example, J&J's website states that:

> The health and safety of the people who use our products is our top priority.
>
> We carefully select ingredients to ensure the safety and performance of our products and include a list of ingredients used on the product's label.
>
> Our Safety & Care Commitment means that every product is carefully reviewed and evaluated against internationally recognized standards. It also includes rigorous safety assurance process designed to meet or exceed industry and regulatory standards for personal care products.[4]

42.    Defendants recently announced that, as with J&J products, the OGX products will no longer be manufactured with DMDM beginning in September 2021, stating they have "switched up formulas to improve hair care results and also removed an ingredient some consumers have questions about."

43.    But even on the portion of the OGX Products website addressing the removal of DMDM, Defendants do not acknowledge or warn of the dangers of DMDM but instead only state:

> Your health is our top priority, and we want you to have a great experience with our products. While our products should never cause hair loss, we also recognize that your health is extremely personal. As with any product, a very small percentage of people may have a hypersensitive allergy to a specific ingredient, which is why we always include a list of ingredients used on our products' label.

---

[4]    https://www.ogxbeauty.com/faqs/

44.     Likewise, on the portion of the OGX Products website addressing the removal of DMDM, Defendants do not acknowledge that consumers have been complaining that the OGX Products have been causing hair loss and other adverse reactions, instead stating that people are concerned about DMDM for the following vague reason:

> People always want the products they buy to have the most innovative ingredients that work for them. We embrace that, and it's why we are constantly listening to your feedback and evolving to create the best products that give you the results you want.

45.     Despite knowing the dangers of DMDM, and working to remove DMDM from their products, Defendants have failed to recall the OGX Products that still contain DMDM, include a patch test or some other means to determine whether a consumer may be allergic or sensitized to the product prior to use, or include an appropriate warning about DMDM Defendants' omissions occurred even after Defendants recognized and received complaints alleging that the OGX Products and similar products containing DMDM had caused hair loss and other injuries.

**C.     Defendants Have Known of the Harms of DMDM for Approximately a Decade**

46.     Defendants include DMDM in their OGX Products even though it even though they know of DMDM's dangers and J&J repeatedly sought to remove DMDM from its other infant and adult care products prior to its acquisition of Vogue.

47.     In 2011, for instance, in response to consumer pressure, J&J pledged to remove formaldehyde from its baby products by the end of 2013, ultimately announcing in January 2015 that it had met that goal.

48.     In August 2012, J&J expanded that pledge and announced that it would remove a host of potentially harmful chemicals, like formaldehyde, from its line of consumer products by the end of 2015, including Neutrogena and Clean & Clear.

49.     In January 2015, J&J announced that it had removed Quaternium-15, a

formaldehyde releasing agent from its popular "No More Tears" Baby Shampoo.

50.     Upon information and belief, Defendants are also aware of the alleged dangers of DMDM through the DMDM related litigation of their competitor, the Unilever Group. In 2012, consumers filed at least three putative class actions alleging that Unilever's Suave Keratin Kit, although advertised to smooth hair and coat it with keratin, in fact caused significant hair loss upon proper application due to the presence of formaldehyde donors. The cases were eventually settled in the Northern District of Illinois, where the first-filed case— *Reid, et al. v. Unilever United States, Inc., et al.*, No. 1:12-cv-06058 (N.D. Ill.) ("*Reid*")—was initiated. *See generally Reid*, Complaint (*Reid* Dkt. 1); *Reid* Settlement Agreement at ¶ 1 (*Reid* Dkt. 90-1).

51.     Among other things, the Unilever plaintiffs alleged that:

- "Unilever United States, Inc. ("Unilever") labeled, advertised, promoted and sold the Treatment targeting women who wanted smooth, shiny, manageable hair with no frizz. Through an extensive marketing campaign and via its website and packaging, Defendant made a number of express warranties: that the Treatment was a Keratin-based smoothing treatment and not a toxic chemical relaxer, that its effects would last no longer than 30 days, that it contained No Formaldehyde, and that it was safe." *Id.* at ¶ 2.

- "In addition, the Defendant falsely claimed that the Treatment contained 'No Formaldehyde,' in all capital letters on the box cover, although the Treatment contains a chemical ingredient that is known to release Formaldehyde upon its use or application." *Id.* at ¶ 4.

- "Defendant failed to do so even though Defendant knew, before or almost immediately upon introduction of the Product in late 2011, that consumers were complaining that the Treatment caused significant hair loss (among other adverse effects, such as chemical burns, hair breakage and hair discoloration)." ¶ 7.

52.     On July 9, 2014, the United States District Court, Northern District of Illinois entered an Order approving the class-wide settlement of the *Reid* case for $10,250,000. *See* Settlement Agreement at ¶ 4 (Dkt. 90-1); Final Approval Order (Dkt. 143). On April 18, 2016, the United States Court of Appeals for the Seventh Circuit approved the settlement. *See*

Mandate and Opinion (Dkts. 219, 220).

53.     Consumers have been complaining about the harmful effects of the OGX Products and other shampoo and hair since at least 2012 on various online sources, including on retailer websites and blogs.

54.     A sample of complaints posted on Amazon.com details scalp reactivity and hair loss:

- 1 out of 5 stars. **FINE HAIR BEWARE**
- Reviewed in the United States on May 19, 2020
- "This absolutely destroys fine hair. I gave this product and matching conditioner two months time to truly see what it would do. I normally had very fine slightly wavy blond hair that was structurally strong, could brush it and barely get any strands out on the brush with using even generic drug store shampoos. My hair was never falling out in large chunks until I started using these products"

- 2 out of 5 Stars. **Not for me**
- Reviewed in the United States on September 2, 2020
- "It made my hair feel really nice at first. However, my hair is still falling out every time I wash my hair. Maybe this protect works for some people, but it's not for me."

- 1 out of 5 stars. **DO NOT BUY THIS PRODUCT IT MADE MY HAIR FALL OUT**
- Reviewed in the United States on May 8, 2019
  WARNING! This product caused my hair to shed and fall out by the hand full!! DO NOT BUY THIS PRODUCT!! I purchased it because I was looking for a sulfate-free conditioner, but instead of protecting my hair from harmful chemicals, this product caused harm. I stopped using it after I realized that this product was to blame for my sudden, severe shedding and my hair is STILL impacted by the harmful ingredients are inside this horrible conditioner).

- 1 out of 5 stars. **Horrible!**
- Reviewed in the United States on December 13, 2019
- "Horrible! I've been using this for about 3 weeks and my hair has been shedding like crazy! It doesn't lather very well which leads me to belief this is knockoff shampoo. I have learned my lesson!."

- 1 out of 5 stars. **Lightly Burned Scalp!**
- Reviewed in the United States on October 22, 2019
- "After the first (and only) wash, my hair looked great, but part of my scalp felt lightly burned. My hair started to look worse over the next few days and my hairdresser told me my hair was stripped when I saw her that weekend.

Wish I could return!"

- 1.0 out of 5 stars. **MAKES HAIR DRY AND FALL OUT**
- Reviewed in the United States on October 17, 2020
  "Made my hair EXTREMELY DRY not moisturizing at all!! It made both my and my fiancé's hair fall out at a concerning pace. It was making my hair fall out in clumps!"

- 1.0 out of 5 stars. **Ruined my hair**
- Reviewed in the United States on August 13, 2020
- I have naturally wavy hair and have been using Kinky Curly products for many years. Once in awhile I like to try something new; my hair was feeling a little dry so I tried OGX Argan Oil Shampoo and Conditioner about a week ago. Before I used these products , my hair was bouncy, full of volume and had just the right amount of wave and curl, it was just a little drier than I liked. Since using these products my hair has been lifeless, oily (my scalp is even breaking out) and the natural curls and waves are actually gone. It's hanging in limp strings. I have repeatedly used a clarifying shampoo every day since, and it is still oily, limp and barely waving at the ends. I believe my hair will recover, but it doesn't look as though this will be happening any time soon. I used these products once. Seven days ago. Don't waste your money.

55.    Defendants continue to tout that certain of their products are free of formaldehyde. For example, on its website, J&J makes clear that DMDM does not meet its "safety and care standards." Moreover, in or about June 2019, J&J reaffirmed its assurance that its baby shampoos do not contain formaldehyde after the company had been accused of including formaldehyde in baby shampoo sold in India.

56.    On the OGX Products' website, Defendants state the benefits of the OGX Products' new DMDM-free formulation (while simultaneously failing to acknowledge the dangers of DMDM):

> In seeking to create haircare products with more balanced pH over the last several years, we've found that by lowering the pH, it helps the hair cuticle to lay flat, which in turn helps hair be its best—softer, shinier, and less prone to frizz.

57.    As a result of the foregoing circumstances, Defendants were on notice of the problems with DMDM and the OGX Products since at least 2012 as evidenced by J&J's own website, J&J's longstanding commitment to remove DMDM from its infant and adult care products, Defendants' accelerated efforts to remove DMDM from OGX Products, various

litigation, and consumer complaints either made directly to Defendants or monitored by Defendants as part of their business operations.

58.     Despite their knowledge of the dangers of DMDM, and despite Defendants' careful efforts to remove DMDM from their products, Defendants only purportedly removed DMDM from their OGX Products in September 2021 and continue to sell OGX Products with DMDM remaining in stores despite the harms posed to consumers like Plaintiff.

59.     Worse yet, Defendants did not warn Plaintiff and consumers of the dangers of DMDM and even now provide misleading information regarding their current effort to remove DMDM from the OGX Products despite being aware of the dangers of DMDM for approximately a decade.

**D.     Plaintiff Used the OGX Products and Suffered Severe Hair Loss and Other Injuries**

60.     From Summer 2017 to Summer 2021, Plaintiff Martinez used OGX Products, including OGX Renewing Argan Oil of Morocco Shampoo; OGX Renewing Argan Oil of Morocco Conditioner; OGX Quenching + Coconut Curls Shampoo; and OGX Quenching + Coconut Curls Conditioner.

61.     Plaintiff Martinez reviewed the labeling and purchased OGX Products based on Defendants' representations, including Defendants' representation that that OGX Quenching + Coconut Curls Shampoo would "enhance natural softness, boost decadent spirals, and tame frizz for beautiful tumbling waves with bounce and shine."

62.     Plaintiff Martinez applied the OGX Products as directed on the rear label and began suffering severe injuries after using the OGX Products, including significant hair loss, hair thinning, severe scalp irritation, rashes, itching, skin discoloration and scabbing. From April 2021 through July 2021, Plaintiff Martinez was devastated as her once healthy and full-bodied hair fell out in clumps after washing her hair with OGX Products and when brushing her hair. Plaintiff lost a significant amount of hair and developed a quarter-sized bald spot in

her head with nearby skin discoloration.

63.     In Summer 2021, Plaintiff Martinez realized for the first time that OGX Products were having a severe adverse impact on her scalp and hair, and she stopped using the OGX Products. Since then, Plaintiff Martinez has no longer been experiencing new hair loss, hair thinning, or scalp irritation and her hair is regaining volume.

## COUNT I
## PRODUCTS LIABILITY: DESIGN DEFECT

64.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

65.     Defendants manufacture, design, distribute, sell, and/or supply hair care products, including the OGX Products. As a result, Defendants have a special responsibility toward any member of the consuming public that may use OGX Products.

66.     The OGX Products manufactured and supplied by Defendants were defective in design or formulation in that, when they left the hands of the Defendants, inherent flaws in the OGX Products rendered the products unreasonably dangerous for the ordinary purposes for which they are fit.

67.     The OGX Products manufactured and supplied by Defendants and used by Plaintiff were defective in design or formulation in that, when the products left the hands of the Defendants, the foreseeable risks of the OGX Products exceeded the benefits associated with their design or formulation, and they were more dangerous than an ordinary consumer would expect.

68.     The OGX Products used by Plaintiff are also defectively designed because they contain the unreasonably dangerous ingredient DMDM, though there are reasonably safe, technologically feasible, and effective alternative preservatives that do not include DMDM or formaldehyde, including sodium benzoate, glyoxylic acid (or derivatives thereof); potassium sorbate and sorbic acid; citric acid and its salts; rosemary oil extract; neem oil extract; lavender

oil; grapefruit seed extract; vinegars; and reducing the amounts of DMDM.

69.     The OGX Products, as dangerously designed, cause an unreasonably high rate of adverse dermatological and other reactions in the general populace due to DMDM (alone or in combination with other ingredients), including hair loss, hair thinning, and scalp irritation, even when used and applied properly.

70.     By marketing a product designed such that it was not reasonably safe, despite the availability of safer alternatives, and failing to sufficiently warn users of the dangers, Defendants were a substantial factor in causing Plaintiff's injuries, including Plaintiff's substantial hair loss and sever scalp irritation.

71.     Plaintiff did not materially alter or modify the OGX Products and Plaintiff used the OGX Products as directed.

72.     As a direct and proximate result of Plaintiff's use of the OGX Products as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendants, Plaintiff suffered harm, damages and economic loss exceeding the jurisdictional minimum and in an amount to be determined at trial.

## COUNT II
## PRODUCTS LIABILITY: FAILURE TO PROVIDE ADEQUATE WARNING

73.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

74.     Defendants manufacture, design, distribute, sell, and/or supply hair care products, including the OGX Products. As a result, Defendants have a special responsibility toward any member of the consuming public that may use OGX Products, including a duty to warn consumers of any known or reasonably foreseeable harms of using the OGX Products.

75.     The OGX Products manufactured and supplied by Defendants which injured Plaintiff were defective due to inadequate warnings or instructions because Defendants knew or should have known that the products created significant risks of serious bodily harm to

consumers and Defendants failed to adequately warn consumers of such risks.

76.     Defendants knew or, in the exercise of reasonable care, should have known that hair care products—including the OGX Products — that contain DMDM (either alone or in combination with other ingredients) and are marketed to be used repeatedly as a cosmetic hair product present a risk of severe reactions—including hair loss, hair thinning, and severe scalp irritation—in many users.

77.     Defendants failed to provide the warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of injuries from use and repeated use OGX Products, considering the likelihood that the products would cause the harm claimed by Plaintiff and considering the likely seriousness of that harm, including the risk of hair loss, hair thinning, and severe scalp irritation.

78.     Defendants, as the manufacturers of OGX Products, are held to the level of knowledge of an expert in the field of that type of hair care product and had a duty to warn consumers of the dangers associated with OGX Products but failed to do so.

79.     The OGX Products manufactured and supplied by Defendants were defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of serious bodily harm from the use of OGX Products, Defendants failed to provide an adequate warning to Plaintiff and consumers of the OGX Products, knowing the product could cause serious injury as set forth herein.

80.     Plaintiff read the product packaging and labeling and followed the deficient directions that were provided with Defendants' OGX Products. As a result, Defendants' inadequate directions and packaging were a substantial factor in causing Plaintiff's injuries.

81.     As a direct and proximate result of Plaintiff's use of OGX Products as designed, sold, supplied, marketed, and introduced into the stream of commerce by Defendants, Plaintiff suffered harm, damages, and economic losses exceeding the minimum amount for jurisdiction

and to be determined at trial and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT III
## NEGLIGENCE

82.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

83.     Defendants have a duty to exercise reasonable care in designing, manufacturing, testing, labeling, marketing, and distributing OGX Products containing DMDM, including a duty to ensure that OGX did not pose a significantly increased risk of injury to Plaintiff and other consumers.

84.     Defendants knew or should have known that OGX Products are marketed to be used on a regular basis to improve hair health and cosmetic appearance.

85.     Defendants knew or should have known that OGX Products containing DMDM could cause severe reactions such as hair loss, hair thinning, and severe scalp irritation (including when used repeatedly) in consumers based on prior admissions and efforts to remove DMDM from products, scientific research, prior lawsuits, and customer complaints made directly to Defendants or third-party websites regularly monitored by Defendants.

86.     Defendants continued to design and manufacture OGX Products containing DMDM, marketed OGX Products containing DMDM as safe and effective, and failed to provide any warnings to consumers regarding the foreseeable risk of using OGX Products.

87.     Defendants failed to exercise reasonable care by negligently, recklessly, or intentionally designing and/or manufacturing OGX Products containing DMDM and/or failing to sufficiently warn consumers of the risks associated with the OGX Products.

88.     As a direct and proximate result of Defendants' negligence, recklessness, or intentional conduct, Plaintiff has suffered significant damages, including severe physical injury, pain, and suffering and will continue to suffer such damages in the future.

## **JURY DEMAND**

89.     Under Fed. R. Civ. P. 38, Plaintiff demands a trial by jury.

## **DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

90.     Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants and issue an Order awarding:

a.      Actual and compensatory damages to Plaintiff;

b.      Punitive, statutory, and exemplary damages, as allowable by law;

c.      Pre- and post-judgment costs, interest, and attorneys' fees;

d.      Such other and further relief as this Court may deem appropriate and equitable.

**DATED:**     New York, New York
November 18, 2021

Respectfully submitted,

**SQUITIERI & FEARON, LLP**

By:     /s/ Stephen J. Fearon, Jr.
Stephen J. Fearon, Jr.
Paul Sweeny
424 Madison Ave., 3rd Fl.
New York, New York 10017
P: (212) 421-6492
F. (212) 421-6553
stephen@sfclasslaw.com
paul@sfclasslaw.com

**ATTORNEYS FOR PLAINTIFF**